IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

TONI L. TOOHEY, individually, and as Personal
Representative of the Heirs and the Estate of
FRANK R. TOOHEY, Deceased; ADAM
TOOHEY; and BRIAN TOOHEY,

                    Plaintiffs,

      v.

THE WYNDHAM WORLDWIDE
CORPORATION HEALTH & WELFARE PLAN;
EMPLOYEE BENEFITS COMMITTEE
WYNDHAM WORLDWIDE CORPORATION;
and WYNDHAM WORLDWIDE
CORPORATION,

                  Defendants.

CV-09-88-ST

FINDINGS AND
RECOMMENDATIONS

STEWART, Magistrate Judge:

///

///

1 - FINDINGS AND RECOMMENDATIONS

## <u>INTRODUCTION</u>

Plaintiff, Toni L. Toohey, brings this action individually and on behalf of the heirs and estate of Frank R. Toohey ("Toohey") to recover sums allegedly due under insurance contracts purchased by Toohey and his employer and issued by Life Insurance Company of North America ("LINA"). The other named plaintiffs are her two sons.

This court dismissed the First Amended Complaint without prejudice for failure to state a claim upon which relief could be granted. *See* Order (docket #43) adopting Findings and Recommendations (docket #37). The First Amended Complaint alleged eight claims for relief, seven arising under state-law theories of contract, tort, and fraud, and one seeking benefits under the Employee Retirement Income Security Act ("ERISA"), 29 USC § 1001, *et seq*. The court found that ERISA preempted the state-law claims and dismissed the ERISA claim for failure to name the proper party as a defendant.

After plaintiffs filed the Second Amended Complaint ("SAC"), this court dismissed Claims Three through Five and struck the jury demand. *See* Order (docket #64) adopting Findings and Recommendations (docket #62). Later this court dismissed defendants Cigna Corporation, Cigna Group Insurance, LINA, and Trustees of the Group Insurance Trust for Employers in the Service Industry. *See* Judgment of Dismissal (docket # 68).

Remaining before the court are Claims One and Two against Wyndham Worldwide Corporation ("WWC"), Wyndham Worldwide Corporation Health & Welfare Plan ("the Plan") and the Wyndham Worldwide Corporation Employee Benefits Committee ("Plan Administrator") (collectively "Defendants"). The First Claim alleges a claim for benefits under ERISA § 502(a)(1)(B) (codified at 29 USC § 1132(a)(1)(B)). The Second Claim alleges

2 - FINDINGS AND RECOMMENDATIONS

equitable estoppel against the Plan and Plan Administrator.  Plaintiffs seek injunctive, equitable,

and monetary relief.  This court has jurisdiction over these claims pursuant to 29 USC § 1132(e)

and 28 USC § 1331.

The parties have filed cross-motions for summary judgment (dockets # 69 & # 73) .  For

the reasons that follow, the motions should be granted in part and denied in part and this case

remanded for the Plan Administrator to resubmit the claim to LINA for reconsideration.

## FACTS

**I.  Background**

Wyndham Resort Development Corporation ("Wyndham Resort Development"), a

subsidiary of WWC, employed Toohey as an account executive until August 4, 2008, when he

died in a plane crash.  SAC, ¶¶ 12, 13, 19.  As part of his job responsibilities, Toohey was

responsible for overseeing timeshare sales at all of Wyndham Resort Development's properties

in Oregon, including the Running Y Ranch Resort ("Running Y") outside Klamath Falls.

Burback Decl., ¶ 2.  His position required him to travel throughout the state, visiting properties

in Seaside, Gleneden, Depoe Bay, Eagle Crest, and Klamath Falls.  Hulme Depo. (attached to

Berry Decl.), p. 56.

Toohey made arrangements to visit the sales team at the Running Y on August 4, 2008,

in order to evaluate the team and provide some hands on training.  *Id*, pp. 16, 21-22.  He planned

to bring Jason Ketcheson ("Ketcheson"), another sales representative, with him to the meeting.

*Id*, p. 21.  Ketcheson was also a licensed commercial pilot.  Berry Decl., Ex. 1, p. 1.  On the

evening of August 3, 2008, Ketcheson rented a small aircraft from a company based out of the

Seaside Municipal Airport, telling the operator that he was making a business trip to Klamath

Falls the following morning. *Id*. Around 6:45 a.m. on August 4, 2008, the plane departed from

Seaside and crashed minutes later in Gearhart, killing Toohey, Ketcheson, and three people on

the ground. *Id*.

Toohey had never before flown with Ketcheson and had never taken a noncommercial

aircraft for work purposes. T. Toohey Depo. (attached to Berry Decl.), p. 9. Approximately two

weeks before the scheduled meeting on August 4, 2008, Toohey told Brad Hulme, manager of

the sales team at the Running Y, that he would be flying down to Klamath Falls for the meeting.

Hulme Depo., p. 22. However, Toohey's supervisors did not know about his plans to take a

noncommercial flight. Pappas Decl., ¶ 2; Burback Decl., ¶ 3.

## II.  Insurance Policies

As an employee of Wyndham Resort Development, Toohey participated in a benefit

package sponsored by WWC. SAC, ¶¶ 13, 14. This benefit package provided employees with

medical coverage, disability insurance, life insurance, accidental death and disability ("AD&D")

insurance, and business travel ("BTA") insurance (collectively, "the Plan"). *Id*; Patton Decl.

(attached as Ex. B to Franecke Decl.), Ex. A, pp. 19-21.

At the time Toohey died, multiple insurance policies funded these benefits, including

Policies Nos. OK 980073, ABL 980053, and ABL 980060. SAC, ¶¶ 14-33; Patton Decl.,

Exs. C-E. Wyndham obtained these three Policies from LINA. *Id*.

Policies Nos. OK 980073 and ABL 980060 provided AD&D coverage. Patton Decl.,

Exs. C & E. Participants automatically received basic AD&D coverage in the amount of 1.5

times their annual salary, and WWC paid the premium on this coverage. *Id*, Ex. A, pp. 4, 8, 21,

& Ex. B, p. 6. Defendants estimate that Toohey's basic AD&D benefits coverage was $588,000.

*Id*, Ex. F, p. 4.  Participants also could elect additional voluntary AD&D coverage in the amount

of two to five times their annual salary.  *Id*, Ex. B, pp. 14-15.  Toohey elected to pay the

premium for the voluntary AD&D coverage in the amount of three times his annual salary for a

maximum recovery of one million dollars.  *Id*, Ex. C, p. 67, & Ex. F, p. 4.

Policy No. ABL 980053 was the BTA policy.  *Id*, Ex. D.  BTA benefit coverage was

automatic for all WWC employees who were eligible to participate in the Plan.  *Id*, Ex. A, p. 4.

WWC paid the entire premiums for BTA coverage.  *Id*, p. 21.  BTA benefit coverage was for

five times the annual salary, for a maximum of one million dollars.  Franecke Decl., Ex. F, p. 6.

All three polices contain the following language:

> This Policy has been issued in conjunction with an employee welfare
> benefit plan subject to the Employee Retirement Income Security Act of
> 1974 ("ERISA").  This Policy is a Plan document within the meaning of
> ERISA.  As respects the Insurance Company, it is the sole contract under
> which benefits are payable by the Insurance Company.  Except for this, it
> shall not be deemed to affect or supersede other Plan documents.
>
> The Plan Administrator has appointed the Insurance Company as the
> named fiduciary for deciding claims for benefits under the Plan, and for
> deciding any appeals of denied claims.

Patton Decl., Ex. C, p. 41, Ex. D, p. 29, & Ex. E, p. 20.

WWC never provided Toohey with copies of the Policies, binder letters, or other

documents which formed the insurance contracts, but did provide several booklets purporting to

describe the benefits available under the Plan.  SAC, ¶¶ 15,16.  These included the "About Your

Participation" booklet, which contained general information about the administration of the Plan,

and the "Life and Accident Insurance Benefits" booklet, which purported to describe the life,

AD&D, and BTA coverages under the Plan.  *Id*, ¶ 16; Patton Decl., Exs. A-B (collectively

referred to as the summary plan description ("SPD")).  The SPD identifies WWC as the Plan's

sponsor and the WWC Employee Benefits Committee as the Plan Administrator.  *Id*, Ex. A, p. 19.

For each of the policies, the Plan designates LINA as the Claims Administrator.  *Id*, Ex. C, p. 41, Ex. D, p. 34, & Ex. E, p. 20.  The Plan Administrator designated LINA as the Claim Fiduciary vested with "the authority, in its discretion to interpret the terms of the Plan, including the Policies; to decide questions of eligibility for coverage or benefits under the Plan; and to make findings of fact."  *Id*, Ex. D, p. 34.  Moreover, all decisions made by LINA were final and binding to the full extent permitted by law.  *Id*.  Under the Plan, LINA was responsible for providing the SPD to the Plan Administrator for dissemination to plan participants and beneficiaries[1].  *Id*.  However, the Plan Administrator was "solely responsible for assuring that any form of SPD which differs from the wording of the SPD provided by [LINA] is consistent with the terms of the applicable Plan documents including the Policies."  *Id*.

Plaintiffs are the named beneficiaries under the Policies.

## III.  Policies and SPD Language

The language used in the SPD to describe benefit exclusions differs from the exclusionary language contained in the Policies.  All three Policies include the following exclusion:

> In addition to any benefit-specific exclusions, benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from any of the following unless coverage is specifically provided for by name in the Description of Benefits Section:
>
>         \* \* \*

---

[1] Defendants offer evidence that despite the language in the Plan, LINA did not prepare the SPD at issue, but it was instead prepared by a third-party firm employed by WWC.  Skrzat Decl., ¶ 2.

6.[2]  flight in, boarding or alighting from an Aircraft or any craft designed to fly above the Earth's surface:

> a.  *except as a passenger on a regularly scheduled commercial airline*;
> b.  being flown by the Covered person or in which the Covered Person is a member of the crew;
> c.  being used for:
>> i.   crop dusting, spraying or seeding, giving and receiving flying instruction, fire fighting, sky writing, sky diving or hang-gliding, pipeline or power line inspection, aerial photography or exploration, racing, endurance tests, stunt or acrobatic flying; or
>> ii.  any operation that requires a special permit from the FAA, even if it is granted (this does not apply if the permit is required only because of the territory flown over or landed on);
>
> d.  designed for flight above or beyond the earth's atmosphere;
> e.  an ultra-light or glider;
> f.  being used for the purpose of parachuting or skydiving;
> g.  being used by any military authority, except an Aircraft used by the Air Mobility Command or its foreign equivalent[.]

Patton Decl., Ex. C, p. 28, Ex. D, p. 13, & Ex. E, p. 11 (emphasis added).

In addition, Policies Nos. OK 980073 (AD&D Policy) and ABL 980053 (BTA Policy)

contain the following exclusion for:

> 8.  travel in any Aircraft owned, leased or controlled by the Subscriber, or any of its subsidiaries or affiliates.  An Aircraft will be deemed to be "controlled" by the Subscriber if the Aircraft may be used as the Subscriber wishes for more than 10 straight days, or more than 15 days in any year.

*Id*, Ex. C, p. 28, & Ex. D, p. 13.

On the other hand, the SPD describes the AD&D and BTA exclusions in the following

manner:

---

[2]  The numbering differs among the Policies, but all three include the same language regarding aircraft exclusions.

AD&D benefits are not payable for losses that result from any of the following causes:

* * *

▪ injury sustained while operating, learning to operate or serving as a member of the crew of an aircraft; while in any aircraft *except as* a fare-paying passenger on a regularly scheduled commercial airline or *as a passenger in a nonscheduled private aircraft used for pleasure purposes with no commercial intent during the flight*[;]

▪ injury sustained while boarding, riding in or leaving an aircraft or any craft designed to fly above the earth's surface that is being used crop dusting, spraying or seeding; fire fighting; sky writing; sky diving, hang gliding, bungee jumping or parasailing; pipeline or power line inspection; aerial photography or exploration; racing endurance tests, stunt or acrobatic flying; parachuting or sky diving; any aircraft or craft that is an ultra-light or glider; or if the aircraft performs any operation that requires a special permit from the FAA even if the permit is granted (this does not apply if the permit is required only because of the territory flown over or landed on) or is being used by any military authority, except as an aircraft used by the Air Mobility Command or its foreign equivalent; or flight in any spacecraft[.]

* * *

The Business Travel Accident Plan does not cover any accidental death, injury or paralysis caused by or resulting from the following[:]

* * *

▪ injury sustained while operating, learning to operate or serving as a member of the crew of an aircraft; while in any aircraft *except as* a fare-paying passenger on a regularly scheduled commercial airline or *as a passenger in a nonscheduled private aircraft. An injury is covered if the private aircraft is owned, leased or controlled by the Company*[;]

▪ injury sustained while boarding, riding in or leaving an aircraft or any craft designed to fly above the earth's surface that is being used crop dusting, spraying or seeding; fire fighting; sky writing; sky diving, or hang gliding; pipeline or power line inspection; aerial photography or exploration; racing endurance tests, stunt or acrobatic flying; parachuting or sky diving; any aircraft or craft that is an ultra-light or glider; or if the aircraft performs any operation that requires a special permit from the FAA even if the permit is granted or is being used by any military authority, except as an aircraft used by the Air Mobility Command or its foreign equivalent; or flight in any spacecraft[.]

*Id*, Ex. B, pp. 8, 11, 17 (emphasis added).

8 - FINDINGS AND RECOMMENDATIONS

## IV.  **Benefit Claims**

On August 29, 2008, LINA denied plaintiffs' claim for AD&D benefits, citing the AD&D Policies' exclusion for losses caused by flight in an aircraft "except as a passenger on a regularly scheduled commercial airline."   Franecke Decl., Ex. E., pp. 27-36.  LINA denied plaintiffs' claim for BTA benefits on September 10, 2008, based upon similar exclusion language contained in the BTA Policy.  *Id*, pp. 37-43.

Represented by counsel, plaintiffs sought a redetermination of LINA's denial of AD&D benefits on October 29, 2008, and for the denial of BTA benefits on November 3, 2008.  *Id*, pp. 46-48, 50-51.  Plaintiffs did not submit any additional materials with their appeals.  *Id*, pp. 48-49.

On November 26, 2008, LINA denied plaintiffs' claims for AD&D and BTA benefits, again citing the exclusions in all three Policies for any loss while a passenger in any aircraft except as a passenger on a regularly scheduled commercial airline.  *Id*, pp. 53-55.  LINA relied upon the WWC proof of loss claim form for Accidental Death benefits, Toohey's death certificate, the NTSB preliminary report, plaintiffs' letter of appeal, and Policies Nos. ABL 980053, ABL 980060, and OK 980073.  *Id*, p. 54.  In summarizing the evidence to support the denial, LINA stated, "Mr. Toohey was a passenger in a private aircraft used for pleasure with no commercial intent during the flight such as paid flight instruction or carrier for hire of passengers or cargo."  *Id*.  The denial letter indicated that "all administrative levels of appeal have been exhausted and we cannot honor any further appeals on this claim . . . Please note that you have a right to bring legal action regarding your claim under the ERISA section 502(a)."  *Id*, p. 55.

Plaintiffs did not seek a review of LINA's denial of benefits to the Plan Administrator, though such a review was permitted under the terms of the WWC employee benefits plan. Patton Decl., Ex. B., p. 18. Instead, plaintiffs filed the current suit.

## STANDARDS

Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 248 (1986). A fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Id.*

While ERISA provides a cause of action for the recovery of benefits, it "does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans. Rather, Congress intended that courts apply contract principles derived from state law but be guided by the policies expressed in ERISA and other federal labor laws." *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F3d 982, 985 (9th Cir 1997) (citation omitted). Accordingly, the terms in an ERISA plan should be interpreted "in an ordinary and popular sense as would a person of average intelligence and experience." *Padfield v. AIG Life Ins. Co.*, 290 F3d 1121, 1125 (9th Cir), *cert denied*, 537 US 1067 (2002) (citation omitted).

## FINDINGS

The Plan is governed by ERISA, and this action was brought pursuant to 29 USC § 1132(a)(1)(B), which permits suits by beneficiaries to recover benefits. It is undisputed that the Plan's Policies unambiguously exclude coverage for death in a private aircraft. However, the

relevant exclusionary language of the SPD differs. The parties disagree on whether the inconsistences and resulting ambiguity in the SPD entitle plaintiffs to recover benefits.

Plaintiffs contend that the ambiguities in the SPD led Toohey to believe that a death that occurred in a private aircraft was covered by the Plan, and that the ambiguities should be construed in plaintiffs' favor and benefits paid. Defendants argue that due to a lack of evidence of reliance by Toohey on the SPD, the SPD is not enforceable regardless of any ambiguities that may exist. In the alternative, defendants assert that even if the SPD is considered, the plain language of the SPD, when construed as a whole, is not ambiguous and excludes benefits.

## I. Conflict of Interest: Standard of Review

ERISA does not specify a standard of review. Filling that statutory gap, courts apply either a *de novo* or an arbitrary and capricious standard of review, depending on whether the administrator has the discretion to interpret the terms of the plan or make benefits determinations. A denial of benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 115 (1989); *Abatie v. Alta Health & Life Ins. Co.*, 458 F3d 955, 962-63 (9th Cir 2006) (*en banc*). However, if the plan vests the administrator with such discretionary authority, then the court reviews the plan administrator's decision only for an abuse of discretion. *Firestone*, 489 US at 115. The term "arbitrary and capricious" also describes this deferential standard of review. *See Dytrt v. Mountain States Tel. & Tel. Co.*, 921 F2d 889, 894 (9th Cir 1990).

No deference to the plan administrator is given under *de novo* review. In contrast, under the arbitrary and capricious standard of review, an administrator's decision "is not arbitrary

unless it is 'not grounded on *any* reasonable basis.'"  *Horan v. Kaiser Steel Ret. Plan*, 947 F2d

1412, 1417 (9th Cir 1991) (emphasis in original), quoting *Oster v. Barco of Cal. Employees' Ret.*

*Plan*, 869 F2d 1215, 1218 (9th Cir 1988).  Also, an arbitrary and capricious standard of review

limits the court's consideration to the evidence reviewed by the plan administrator at the time the

eligibility decision was made.  *McKenzie v. Gen. Tel. Co. of Cal.*, 41 F3d 1310, 1316 (9th Cir

1994), *cert denied* 514 US 1066 (1995); *Taft v. Equitable Life Assur. Soc.*, 9 F3d 1469, 1471 (9th

Cir 1993).

Which standard of review applies depends primarily upon the terms of the plan.  A plan

confers discretion when it "includes even one important discretionary element, and the power to

apply that element is unambiguously retained by its administrator."  *Bogue v. Ampex Corp.*, 976

F2d 1319, 1325 (9th Cir 1992), *cert denied* 507 US 1031 (1993).  The grant of discretion "should

be clear: unless plan documents unambiguously say in sum or substance that the Plan

Administrator or fiduciary has authority, power, or discretion to determine eligibility or to

construe the terms of the Plan, the standard of review will be *de novo*."  *Sandy v. Reliance*

*Standard Life. Ins. Co.*, 222 F3d 1202, 1207 (9th Cir 2000).  The authority to determine eligibility

for benefits "inherently confers discretion" upon the plan administrator.  *Snow v. Standard Ins.*

*Co.*, 87 F3d 327, 330 (9th Cir 1996).

In an addendum, the Plan confers full discretionary authority on LINA to determine

eligibility for benefits and construe the terms of the Plan:

> Claim Fiduciary shall be responsible for adjudicating claims for benefits
> under the Plan, and for deciding any appeals of adverse claim
> determinations.  Claim Fiduciary shall have the authority, in its discretion,
> to interpret the terms of the Plan, including the Policies; to decide
> questions of eligibility for coverage or benefits under the Plan; and to
> make any related findings of fact.  All decisions made by such Claim

Fiduciary shall be final and binding on Participants and Beneficiaries of
the Plan to the full extent permitted by law.

Patton Decl., Ex. D, p. 34.

At oral argument, the parties disagreed whether the addendum conferring this discretion

applies to all three Policies, since it is attached only to Policy No. ABL 980053.  In the first

paragraph, the Plan appoints LINA as the Claim Fiduciary, "to the extent that such benefits are

funded by policies of insurance issued by such companies ("Policies")."  Although it is attached

to only one Policy, this language is sufficient to cover all Policies issued to WWC by LINA.

Plaintiffs argue that the phrase "to the full extent permitted by law" somehow limits the Plan's

grant of discretion to LINA.  That argument is rejected because that phrase is found only in the

sentence referring to the finality of decisions made by LINA, and does not qualify the prior

sentence concerning the scope of the appointment.  Thus, "*de novo* review does not apply; abuse

of discretion review does."  *Abatie*, 458 F3d at 965.

However, where "a benefit plan gives discretion to an administrator or fiduciary who is

operating under a conflict of interest, that conflict must be weighed as a factor in determining

whether there is an abuse of discretion."  *Firestone*, 489 US at 115.  Abuse of discretion review

is required "whenever an ERISA plan grants discretion to the plan administrator, but a review

informed by the nature, extent, and effect on the decision-making process of any conflict of

interest that may appear in the record.  This standard applies to the kind of inherent conflict that

exists when a plan administrator both administers the plan and funds it, as well as to other forms

of conflict."  *Abatie*, 458 F3d at 967.  Courts must "temper the abuse of discretion standard with

skepticism 'commensurate' with the conflict."  *Nolan v. Heald College*, 551 F3d 1148, 1153 (9th

Cir 2009), quoting *Abatie*, 458 F3d at 959, 965, 969.

13 - FINDINGS AND RECOMMENDATIONS

The importance that courts attach to the conflict depends on the "conflict's nature, extent, and effect on the decision-making process." *Id* at 1153, quoting *Abatie*, 458 F3d at 970 (remaining citation omitted). A variety of factors may be considered, including the monetary conflict (structural conflict of interest), the emphasis by the administrator of evidence favorable to a denial of benefits and de-emphasis of unfavorable evidence, inconsistent explanations for claims denials, the presence of procedural irregularities in the claims process, and evidence which tends to show bias or bad faith. *See Metro. Life Ins. Co. v. Glenn*, 554 US 105, – , 128 S Ct 2243, 2351-52 (2008) (financial incentives, emphasis of evidence favoring denial of benefits, failure to provide independent experts all relevant evidence); *Nolan*, 551 F3d at 1155 (bias); *Abatie*, 458 F3d at 968 (inconsistent reasons for claims denial, failure to adequately investigate, failure to credit reliable evidence, making decisions against the weight of the evidence); *Friedrich v. Intel Corp.*, 181 F3d 1105, 1110 (9th Cir 1999) (procedural irregularities in initial claims process and unfair appeal process); *Lang v. Long Term Disability Plan*, 125 F3d 794, 797 (9th Cir 1997) (inconsistent reasons). The reviewing court must make "something akin to a credibility determination about the insurance company's or plan administrator's reason for denying coverage under a particular plan and a particular set of medical and other records." *Abatie*, 458 F3d at 969. Moreover, evidence which might materially affect the abuse of discretion standard of review must be viewed "through the lens of the traditional rules of summary judgment" and in the light most favorable to the non-moving party. *Nolan*, 551 F3d at

1154-55.[3]  Courts may consider evidence outside the administrative record to determine the

nature, extent, and effect of any conflict of interest.  *Id* at 1154.

LINA has a structural conflict of interest as it both determines eligibility for benefits and

pays benefit awards.  An inherent financial conflict in a case such as this, where the benefits in

dispute are over $2,500,000,[4] must be considered in determining the effect this conflict had on

the decision-making process.  Plaintiffs contend that LINA actively concealed the conflict

between the Plan documents and the SPD during the review process, but has not presented any

evidence of malice, self-dealing, parsimonious claims-granting history, or inconsistent reasons

for denial.  Nor have defendants presented any evidence, as suggested by the Ninth Circuit, to

show that the alleged conflict of interest did not affect the benefits decision:

> [A] conflicted administrator, facing closer scrutiny, may find it advisable
> to bring forth affirmative evidence that any conflict did not influence its
> decisionmaking process, evidence that would be helpful in determining
> whether or not it has abused its discretion.  For example, the administrator
> might demonstrate that it used truly independent medical examiners or a
> neutral, independent review process; that its employees do not have
> incentives to deny claims; that its interpretations of the plan have been
> consistent among [beneficiaries]; or that it has minimized any potential
> financial gain through structure of its business (for example through a
> retroactive payment system).

*Abatie*, 458 F3d at 969 n7.

---

[3]  Assuming that the record is devoid of evidence which might materially affect the abuse of discretion standard of review, the court dispenses with the usual tests of summary judgment:  "Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply."  *Bendixon v. Standard Ins. Co.*, 185 F3d 939, 943 (9th Cir 1999), overruled on other grounds by *Abatie*, 458 F3d at 965.

[4] Defendants estimate that plaintiffs would be entitled to benefits totalling $2,588,000.  That amount includes $588,000 for basic AD&D benefits, $1,000,000 for basic BTA benefits, and $1,000,000 for voluntary AD&D benefits.  Franecke Decl., Ex. F, p. 4.

Consequently, the court has limited information from which to determine the extent of the conflict of interest.  The record is clear that LINA's financial stake was significant, as it was responsible for paying benefits and was charged with interpreting the terms of the Plan and determining benefit eligibility in an exceedingly large claim.  As the writer of the policies, LINA had even more of a stake in the outcome, which was compounded by the fact that the Plan clearly designated responsibility to LINA for providing the SPD to the Plan Administrator. Defendants now assert that LINA was not actually responsible for writing the SPD and delegated that responsibility to a third party.  Regardless of who wrote the SPD, the Plan indicates that LINA was to be given the SPD for use in making benefit determinations.  Because the benefits decision hinged upon whether the SPD or Policies controlled, and LINA not only had a significant financial stake, but also was responsible for writing the Policies, the court will apply a heightened degree of skepticism in reviewing the decision for abuse of discretion.

## II.  Contradictions Between SPD and Policies

"The primary document governing an employee benefit plan is the master plan document, which sets forth the terms and conditions of the plan.  Those terms and conditions are then summarized for employees in the benefit plan's summary plan description."  *Providence Health Plans of Oregon v. Simnitt*, 2009 WL 700873 at *5 (D Or March 13, 2009), citing *Pisciotta v. Teledyne Indus.*, 91 F3d 1326, 1329 (9th Cir 1996).  ERISA requires that every employee subject to a qualifying plan receive an SPD.  29 USC § 1022(a).  An SPD must be "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."  *Id*.  The SPD is the participant's "primary source of information

regarding employment benefits," and is itself a part of the plan.  *Bergt v. Ret. Plan for Pilots*

*Employed by MarkAir, Inc.*, 293 F3d 1139, 1143 (9th Cir 2002) (citations omitted).

When interpreting an ERISA plan, the plan documents must be construed as a whole.  *Id*

(citations omitted).  When the terms of a plan document conflict with the SPD, the document

more favorable to the participant controls.  *Id*, p. 1145.  The Ninth Circuit has determined that:

> Any burden of uncertainty created by careless or inaccurate drafting of the
> summary must be placed on those who do the drafting, and who are most
> able to bear the burden, and not on the individual employee, who is
> powerless to affect the drafting of the summary or the policy and ill
> equipped to bear the financial hardship that might result from a misleading
> or confusing document.  Accuracy is not a lot to ask.

*Id*, citing *Hansen v. Continental Ins. Co.*, 940 F2d 971, 981-82 (5th Cir 1991).

This conclusion rests on the theory that "the law should provide as strong an incentive as

possible for employers to write the SPDs so that they are consistent with the ERISA plan

documents, a relatively simple task."  *Id* (citations omitted).

Here, the SPD and the Policies contain drastically different language concerning the

exclusions related to air travel.  The Policies unambiguously deny coverage unless the loss

occurred while Toohey was "a passenger on a regularly scheduled commercial airline."  Patton

Decl., Ex. C, p. 28, Ex. D, p. 13, & Ex. E, p. 11.  The parties agree that under the terms of the

Policies, plaintiffs cannot recover benefits.  On the other hand, the exclusionary language in the

SPD is much broader.  It provides that "AD&D benefits are not payable for losses . . . while in

any aircraft except as a fare-paying passenger on a regularly scheduled commercial airline or as

a passenger in a nonscheduled private aircraft used for pleasure purposes with no commercial

intent during the flight[.]"  *Id*, Ex. B, pp. 8, 17.  It also states that the BTA Policy "does not

cover any accidental death, injury, or paralysis . . . while in any aircraft except as a fare-paying

17 - FINDINGS AND RECOMMENDATIONS

passenger on a regularly scheduled commercial airline or as a passenger in a nonscheduled private aircraft.  An injury is covered if the private aircraft is owned, leased or controlled by the Company[.]"  *Id*, p. 11.

None of the Plan documents define the key terms that distinguish the exclusionary clauses in the SPD from the straightforward exclusion in each of the Policies.  Namely, there is no definition of a "nonscheduled private aircraft" or what is meant by the phrase "used for pleasure purposes with no commercial intent during the flight."  Further complicating the issue is that the SPD itself is inconsistent, adding the restriction that the aircraft "be used for pleasure purposes with no commercial intent during the flight" only for AD&D benefits, and that "an injury is covered if the private aircraft is owned, leased or controlled by the Company" only for BTA benefits.

Such a contradiction is of the type addressed in *Bergt* because the additional language in the SPD greatly expands the class of aircraft covered by the policies.  Moreover, the additional AD&D requirement that the aircraft be "used for pleasure purposes with no commercial intent," and the additional BTA exception that "an injury is covered if the private aircraft is owned, leased or controlled by the Company," further modifies the aircraft exclusion as set forth in the Policies.  By adding these phrases, the drafters eliminated as a possible interpretation that the Policies apply only when the accident occurs while a passenger on regularly scheduled commercial airline and opened up a whole host of additional possibilities, depending upon how the phrases "used for pleasure purposes with no commercial intent" and "the private aircraft is owned, leased or controlled by the Company" are interpreted.

18 - FINDINGS AND RECOMMENDATIONS

When the master plan documents and the SPD so directly conflict, the "important policy of protecting plan members from misleading or false information contained in a plan document" is implicated. *Simnitt*, 2009 WL 700873 at *5. Moreover, Toohey was never provided copies of the Policies and had only the SPD to rely upon, thereby further implicating *Bergt*'s equitable principle that beneficiaries are entitled to rely upon the plan documents that have been provided. *See id.* Accordingly, the court must apply the version that is more favorable to the claimant. In this case, that version is contained within the SPD.

## III. Reliance

Defendants contend that even if the SPD controls, it is not enforceable because plaintiffs have not shown Toohey's reliance upon it. In response, plaintiffs assert that the Ninth Circuit does not require reliance upon the more favorable document in order for it to control and that even if it does, they have presented ample evidence of reliance.

### A. Plaintiffs' Burden

The parties do not dispute that the Ninth Circuit has not directly addressed the issue of whether a claimant must demonstrate reliance on the SPD in order for its more favorable language to trump the plan's language. Defendants urge the court to adopt the reasoning in *Skinner v. Northrop Grumman Retirement Plan B*, 2010 WL 679061 (CD Cal Jan. 26, 2010). There the court held that a claimant seeking to invoke a favorable SPD provision must show that he reasonably relied upon the provision and that because of this reliance, he "did or did not take action resulting in the forfeiture of the very benefit sought." *Id* at *8, quoting *Adams v. J.C. Penney*, 865 F Supp 1454, 1461 (D Or 1994), *aff'd*, 83 F3d 426 (9th Cir 1996). The court noted that most circuit courts addressing this issue "require either a showing of reasonable reliance or a

more stringent showing of prejudice." *Id* at *7, citing *Mauser v. Raytheon*, 239 F3d 51, 59 (1st

Cir 2001); *Wilkins v. Mason Tenders Pension Fund*, 445 F3d 572, 585 (2nd Cir 2006); *Siltner v.

Beretta*, 74 F3d 1473, 1478 (4th Cir 1996); *Health Cost Controls v. Washington*, 187 F3d 703,

711 (7th Cir 1999); *Koons v. Aventis Pharmaceuticals*, 367 F3d 768, 775 (8th Cir 2004); *Chiles v.

Ceridian Corp.*, 95 F3d 1505, 1519 (10th Cir 1996); *Branch v. G. Bernd Co.*, 955 F2d 1574, 1579

(11th Cir 1992). The *Skinner* court also relied upon three district court cases in this circuit,

including one from this court, holding that reasonable reliance is required in order to recover

under the terms of a contradictory, more favorable SPD. *Id*, citing *Adams*, 865 F Supp at 1460

(finding plaintiff's evidence of reliance wholly insufficient and granting defendants' motions for

summary judgment); *Kaiser Permanente Plan v. Bertozzi*, 849 F Supp 692, 698 (ND Cal 1994)

(finding decedent's telephone call and letter to insurer in an attempt to satisfy the SPD

requirements prior to her death sufficient to preclude summary judgment); *Berry v. Blue Cross*,

815 F Supp 359, 364-65 (WD Wash 1993) (holding that plaintiffs were required to prove

reasonable reliance on the SPD in making their health coverage decisions, but leaving the

reasonableness inquiry to the factfinder).

  *Skinner* adopted the rule as articulated by this court in *Adams*. In *Adams*, the claimant

maintained that the plan and the SPD differed as to what constituted hearing loss, and the only

evidence of reliance was that, after being told by a representative of her employer that her claim

was not covered, the claimant made unrelated expenditures in greater amounts than she would

have otherwise based solely on the more favorable SPD. *Adams*, 865 F Supp at 1462-63. The

court found that the claimant's alleged reliance was insufficient because it was made in the face

of contradictory information and did not affect the benefits sought since the expenditures were

for her daughter's education and a new car, and to hold that such actions constitute reasonable reliance would "vitiate the very requirement of reliance." *Id* at 1463. In applying the reasonable reliance rule, *Skinner* found that the plaintiffs' evidence of reliance was inadequate because they asserted only that they continued their employment without any evidence that such continued employment would forfeit their benefits. 2010 WL 679061 at *8. The court emphasized the importance of avoiding an "unintended windfall" to participants if employers are strictly liable for a defective SPD which could potentially discourage employers from offering plans. *Id* at *7 ("[R]equiring reasonable reliance before a participant can recover greater benefits than the plan sponsor intended based on a defective SPD fosters the balance Congress sought to achieve between protecting participants and maintaining incentives for employers to offer benefit plans.").

Plaintiffs point to a more recent case by another district court in this circuit which declined to adopt the reasonable reliance rule. *Goldinger v. Datex-Ohmeda Cash Balance Plan*, 2010 WL 1270191 (WD Wash March 31, 2010). That court reasoned that the Ninth Circuit would not impose a reliance requirement, pointing out that the three district court cases requiring reasonable reliance all predated the Ninth Circuit's decision in *Bergt*. It further distinguished the contrary district court cases by citing to another district court case, *Lancaster v. U.S. Shoe Corp.*, 934 F Supp 1137, 1154-55 (ND Cal 1996), holding that an inaccurate SPD controls over the plan, regardless of whether the claimant can show reliance upon the SPD, because such an objective test would encourage insurers to ensure that SPDs clearly reflect plan provisions and provide clearer expectations about the likely outcome of disputes. The court also relied on the Ninth Circuit's clear directive that ambiguities in ERISA plans should be construed against the drafter. Because SPDs are participants' "primary source of information regarding employment

benefits," a "rule that insulates plan administrators from liability for most errors in SPDs promotes careless drafting of SPDs and undermines the effectiveness of SPDs in apprising participants of their rights and obligations." 2010 WL 1270191 at *7. To further underscore the importance of accurately drafted SPDs, *Goldinger* emphasized that Congress has enacted statutes and regulations that "tightly control the content of an SPD." *Id*, citing 29 USC § 1022(b); 29 CFR §§ 2520.102-2 to 2520.102-4.

Based on a review of these authorities, this court is inclined to adhere to its previous ruling, which also has been adopted by a majority of other courts, that a claimant must demonstrate reliance on the SPD in order for its more favorable language to trump the plan's language.

### B.  Evidence of Reliance

There is no way to know what Toohey was thinking when he decided to take a private flight to Klamath Falls on August 4, 2008, leaving only circumstantial evidence to determine whether he reasonably relied upon the SPD. Mrs. Toohey asserts that she and her husband relied upon the SPD based upon the following evidence: (1) they never received a copy of the Policies; (2) in making the benefit election every year, they consulted the SPD; and (3) had the SPD indicated that there would be no coverage for flight in a private aircraft, Toohey would not have taken the flight, as it would have been contrary to company policy.

It is undisputed that the Tooheys never received a copy of the Policies and that they consulted the SPD when making their benefit election for the year. T. Toohey Depo, pp. 14-16, 24. This testimony is bolstered by Toohey's benefit election history, indicating that he changed his voluntary AD&D coverage several times. Franecke Decl., Ex. E, pp. 19-26. For the 2006 benefit year, he changed his election from a complete waiver of the voluntary AD&D coverage

22 - FINDINGS AND RECOMMENDATIONS

to selecting coverage that was five times his annual salary.  *Id*, p. 26.  For the 2007 benefit year, he dropped the coverage down to four times his annual salary, and for the 2008 year, he again modified his coverage, to three times his annual salary.  *Id*, pp. 19, 22.

This case is distinguishable from *Adams* and *Skinner* where the alleged reliance was entirely unreasonable and without basis.  This is not a case where the claimant admittedly had no knowledge of the SPD prior to the claim or where the claimant took objectively unreasonable action wholly unrelated to the claimed benefit on the basis of contradictory information.  Instead, the record indicates that prior to his death, Toohey was in possession of the SPD and made changes to the voluntary AD&D coverage every year during the open enrollment period which lends support to the claim that he read, relied upon, and made decisions based upon the SPD content.  While it is unknown whether Toohey consulted the SPD prior to making his travel plans for the morning of August 4, 2008, this action is the type anticipated by the SPD in order to furnish participants with information regarding coverage and under what circumstances coverage would be denied.  Toohey's decision to fly on a private aircraft is directly related to the claimed benefit.  Since the Tooheys never received copies of the Policies, they had no contradictory information upon which to make decisions.  Thus, it is reasonable to conclude that Toohey relied upon the terms of the SPD to his detriment.  As a result, plaintiffs have presented minimal, but sufficient, circumstantial evidence of reasonable realiance upon the SPD.

///

///

## IV.  Entitlement to Benefits

Defendants argue that even if the SPD controls, LINA, as the Claims Administrator, did not abuse its discretion by denying benefits because plaintiffs failed to bring the SPD to LINA's

attention during the review process and because the plain language of the SPD is consistent with the denial of benefits.  Plaintiffs assert that because the SPD was part of the Plan, they were not required to bring it specifically before the Claims Administrator during the review process and that LINA's failure to consider the SPD was a clear abuse of discretion.  Plaintiffs further claim that the clear language in the SPD covers the flight in question, and that LINA is bound by its statement supporting its final denial of benefits.

### A. <u>Exhaustion</u>

As a general rule, a plan participant must first exhaust the plan's internal review proceedings before bringing a lawsuit regarding the denial of benefits.  *Diaz v. United Agr. Employee Welfare Ben. Plan and Trust*, 50 F3d 1478, 1483 (9th Cir 1995), citing *Amato v. Bernard*, 618 F2d 559, 566-68 (9th Cir 1980).  Thus, claims may be waived if not first presented in administrative proceedings.  *See Bahnaman v. Lucent Technologies, Inc.*, 219 F Supp2d 921, 925 (ND Ill 2002).  However, a plan participant need only exhaust claims, not theories or issues; so long as the claim was properly raised, the participant may raise any theory or issue in subsequent court proceedings, if it is based upon information that was before the administrative review body.  *Id.*

Here, the parties dispute whether plaintiffs properly raised the issue of their reliance upon the conflicting SPD provisions during the review process.  There is no dispute that during the review process, plaintiffs consistently claimed that they were eligible for AD&D and BTA benefits.  Plaintiffs repeat that same claim here, and there is no indication that any of the facts relied upon in this action were not brought to LINA's attention.  Moreover, LINA, as the Claims Administrator, was required to obtain information adequate to make an informed decision.

*Booten v. Lockheed Med. Benefit Plan*, 110 F3d 1461, 1463-64 (9th Cir 1997), citing *Kunin v.*

*Benefit Life Trust Ins. Co.*, 910 F2d 534, 538 (9th Cir 1990) (burden is on plan administrator to obtain adequate information to make decision).  Despite the Plan's conferral of responsibility to LINA for drafting the SPD based upon the standard certificates of insurance, defendants now contend that a third party actually drafted the SPD and that LINA did not review the SPD at all during the review process.  Consequently, LINA, in its duty to make an informed decision should have, at a minimum, reviewed all the relevant Plan documents.  Since the SPD was a Plan document, plaintiffs were not required to specifically draw LINA's attention to it in order to properly raise the claim.

**B.  <u>Coverage under the SPD</u>**

The SPD provides that both AD&D and BTA benefits are not payable for losses while in an aircraft, subject to two exceptions:  (1) if the participant is a fare paying passenger on a regularly scheduled commercial airline; or (2) while a passenger in a nonscheduled private aircraft.  The first exception, consistent with the Policies, unambiguously excludes coverage.  At issue is the second exception.  The SPD requires that in order to be covered while a passenger in a nonscheduled private aircraft, the aircraft must be "used for pleasure purposes with no commercial intent during the flight."  The BTA Policy contains an additional sentence, stating that "[a]n injury is covered if the private aircraft is owned, leased or controlled by the company." The parties hotly dispute the meaning of these additional phrases.

With regard to the AD&D Policies, it is curious that the final denial letter dated November 3, 2008, stated that the decision to deny benefits was because "[t]he information in [the] file supports the fact that Mr. Toohey was a passenger in a private aircraft used for pleasure with no commercial intent at the time of his death."  Franecke Decl., Ex, E, p. 54.  This is the precise language that appears in the SPD as an exception to the aircraft exclusion for entitlement

to AD&D benefits.  It also is the same language used by plaintiffs' counsel in the October 29,

2008 letter appealing the denial of benefits.  *Id*, p. 46.  It is unclear if LINA, in using this

language, was referring to the SPD or to counsel's letter or was making an intentional admission,

as opposed to simply repeating the wording used by plaintiff's counsel.  The denial letter also

states that the airplane had "no commercial intent during the flight such as paid flight instruction

or carrier for hire of passengers or cargo" which also parrots the language in counsel's letter.  *Id*.


        The Plan does not define the phrase "used for pleasure purposes with no commercial

intent during the flight," and each side has posited a reasonable interpretation.  Plaintiffs contend

that the exclusion requires that the "commercial intent" occur *during* the flight, such as if

Toohey had been taking a client down to Klamath Falls in order to make a sale.  Under this

interpretation, the fact that Toohey intended to engage in business once exiting the aircraft is

irrelevant because the SPD only excludes commercial activity during the flight itself.

Defendants argue that Toohey's use of the aircraft to travel to a business meeting necessarily

confers commercial intent because he intended to engage in business upon arriving his

destination.  In contrast, had he used the aircraft to travel to Klamath Falls for vacation, then

Toohey would have lacked any commercial intent.  Thus, at least two reasonable interpretations

are possible for the phrase "used for pleasure purposes with no commercial intent during the

flight" in the SPD, rendering the SPD ambiguous with regard to entitlement to AD&D benefits.

        Turning next to the SPD provisions governing the BTA Policy, defendants contend that

the second sentence serves as an additional limitation, such that a beneficiary may only recover

if the loss occurs while in a nonscheduled private aircraft that is "owned, leased, or controlled by

the Company."  In interpreting this provision, ERISA requires that the interpretation of terms be

26 - FINDINGS AND RECOMMENDATIONS

guided by principles of contract and plan documents construed as a whole.  Consistent with this undertaking, courts should "look to the agreement's language in context and construe each provision in a manner consistent with the whole such that none is rendered nugatory."  *Dupree v. Holman Professional Counseling Centers*, 572 F3d 1094, 1097 (9th Cir 2009) (citations omitted). The first sentence provides that all losses as a passenger on a nonscheduled private aircraft are covered.  To find that the second sentence does not serve to qualify losses on a nonscheduled private aircraft would render the first sentence meaningless.  Thus, the second sentence can be reasonably interpreted to mean only that losses are recoverable if they occur in a nonscheduled private aircraft owned, leased or controlled by WWC.

In determining what is meant be "owned, leased, or controlled" to the facts of this case, Policies Nos. OK 980073 (AD&D Policy) and ABL 980053 (BTA Policy) contain the following definition:

> An Aircraft will be deemed to be "controlled" by the Subscriber if the Aircraft may be used as the Subscriber wishes for more than 10 straight days, or more than 15 days in any year.[5]

Patton Decl., Ex. C, p. 28, Ex. D, p. 13.

The evidence in the record indicates that Ketcheson, an employee of WWC, rented the aircraft for just one day.  Thus, the aircraft was not "controlled" by WWC under the terms of the Plan.  It is undisputed that the airplane also was not "owned" by WWC.  Thus, in order to be awarded BTA benefits, plaintiffs must establish that the airplane was "leased" by WWC.  Even if a one day rental qualifies as a lease, the limited record currently before the court does not shed

---

[5] This provision in the Policies serves as an additional exclusion, expressly providing that losses resulting from travel in an aircraft, even if owned, leased, or controlled by the company, are not covered.  The SPD provides the exact opposite, and as discussed above, the more favorable provision controls.  Nevertheless, the definition provides helpful guidance.

any light on whether that lease was by WWC.  There may be other facts relevant to this determination that were not considered by LINA in the initial claims determination.

**V.  <u>Remand</u>**

The Ninth Circuit has made it clear that "remand for reevaluation of the merits of a claim is the correct course to follow when an ERISA plan administrator, with discretion to apply a plan, has misconstrued the Plan and applied the wrong standard to a benefits determination." *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F3d 455, 461 (9th Cir 1996).  Given defendants' assertion that LINA did not use the SPD in making the initial benefit determination, it is clear that the Claims Administrator "has not yet had the opportunity of applying the Plan, properly construed, to [plaintiffs'] application for benefits."  *Id* at 460.  "It is not the court's function *ab initio* to apply the correct standard to the participant's claim."  *Id* at 461 (citation omitted).  Under the terms of the Plan, LINA, as Claims Administrator, is charged with determining benefit claims and has not yet had a chance to make a benefit determination here based upon the SPD.

As discussed above, the SPD and Policies conflict, plaintiffs have made the required showing of reliance on the SPC, the relevant provision in the SPD concerning AD&D benefits is ambiguous, and LINA never had occasion to apply the SPD concerning BTA benefits to the facts underlying this claim.  Because LINA has not made a determination regarding the applicability of the SPD to plaintiffs' claims, this court cannot review that determination for an abuse of discretion.  Accordingly, the Plan Administrator should resubmit plaintiffs' claims to LINA to consider the SPD.

<u>**RECOMMENDATIONS**</u>

28 - FINDINGS AND RECOMMENDATIONS

For the reasons discussed above, plaintiffs' Motion for Summary Judgment (docket #69) and defendants' Motion for Summary Judgment (docket # 73) should be GRANTED in part and DENIED in part and this matter should be remanded for the Plan Administrator to resubmit the claim to LINA for reconsideration.

### SCHEDULING ORDER

The Findings and Recommendations will be referred to a district judge. Objections, if any, are due June 16, 2010. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED this 28th day of May, 2010.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge